## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**Keila RAVELO,**<br>　　　　　　　**Defendant.** | Crim. No. 15-576 (KM)<br><br>**OPINION AND ORDER** |

The defendant, Keila Ravelo, is charged in a nine-count Indictment with conspiracy to commit wire fraud (18 U.S.C. § 1349); four substantive counts of wire fraud (18 U.S.C. § 1343); and four counts of tax evasion (26 U.S.C § 7201). The central factual allegation is that Ms. Ravelo, while a partner at two New York law firms, engaged in a fraudulent invoicing scheme to enrich herself and her husband, Melvin Feliz. The nature of the accusation is that Ravelo and Feliz formed two companies ("Vendor 1" and "Vendor 2"). Those companies billed the law firms (which in turn billed clients) for litigation support services that were never performed. (*See* Indictment, ECF no. 66, Count 1.) As to Ms. Ravelo, of course, these are allegations only; they have not been tested by any fact finder.

In connection with Ms. Ravelo's arrest at her home, federal agents took custody of her iPhone cellular telephone. Ms. Ravelo contends that the seizure of her iPhone was illegal at its inception under the Fourth Amendment. That illegality, she argues, tainted all that followed, including a subsequent search warrant that authorized the government to review certain information stored in the iPhone. Now before the Court is Ms. Ravelo's motion, which (as it has evolved) now comprises a motion to suppress any material recovered from the telephone and to compel the return of her property, pursuant to Fed. R. Crim. P. 41(g) and (h).

The prosecution cannot yet identify what material from the cellular telephone it would offer in evidence.[1] The key facts on this motion, however, do not primarily relate to the contents of the phone; rather, they involve the circumstances under which it was seized. I therefore rejected the government's suggestion that a decision be deferred, and ordered an evidentiary hearing on the motion.

That evidentiary hearing took place on September 19, 2016. The prosecution introduced the testimony of IRS Special Agent Cheryl Matejicka. The defense called IRS Supervisory Special Agent Linda Masessa, who is now retired, and Michael Feliz, who is Ms. Ravelo's son. At the close of the hearing, it appeared that the legal arguments had shifted to some degree. I therefore granted leave to submit additional briefing.

After receiving that additional briefing, I scheduled oral argument for October 27, 2016. As defense counsel described the current state of the motion, the need to resolve conflicts in the testimony had been reduced, if not eliminated. The real Fourth Amendment issue, as he saw it, rested on one uncontested fact: that during the arrest process, the agent picked up Ravelo's iPhone. An illegal seizure occurred, he said, at the moment the agent handled the telephone.

The government replied that this was not an illegal seizure. Rather, the agent had picked up the telephone with the consent of Ms. Ravelo, who wished to ascertain the telephone number of her attorney. As a backup argument, the government invoked inevitable discovery.[2]

For the reasons stated herein, the motion for suppression and return of property will be denied.

---

[1] The contents of the cell phone are being reviewed, not by the prosecuting attorneys, but by a "taint team" under the direction of an independent Privilege Agent and Privilege AUSA. The taint team is screening the contents of the phone, primarily to identify any privileged material (Ravelo, recall, is an attorney). Apparently there is a large volume of material; the taint team has not yet completed its review.

[2] The government does not rely on a theory of search incident to arrest, *i.e.*, a so-called "wingspan" search. *See* Tr. (ECF no. 101) at 54.

## A.   Factual Findings

These factual findings are based on the transcript of the September 19, 2016 evidentiary hearing. (The transcript, filed at ECF no. 101, is cited herein as "Tr.").

On December 19, 2014, Magistrate Judge Joseph A. Dickson issued a criminal complaint charging Ms. Ravelo and her husband, Melvin Feliz, with conspiracy to commit mail fraud, in violation of 18 U.S.C. § 1349. (Mag. No. 14-6800) On December 22, 2014, a team of agents went to the home of Ravelo and Feliz to execute warrants for their arrest.[3] Two of the agents on the team were Cheryl Matejicka and Linda Masessa, both of the IRS.

Inside the home, Matejicka, Masessa, and other agents climbed two sets of stairs and encountered Ms. Ravelo in the hallway on an upper floor. (Tr. 6:15, 67:18) The agents arrested and handcuffed Ravelo, and secured the premises. (Tr. 6:18, 68:11, 70:10) Ravelo was Mirandized. (Tr. 69:7)

Ms. Ravelo asked to use the bathroom adjoining the hallway. Agents Matejicka and Masessa uncuffed Ravelo and allowed her to do so. (Tr. 7:3, 70:10) Ravelo was wearing sleep clothes, not street clothes appropriate for

---

[3]      Complicating the picture is a prior criminal complaint and indictment filed against Mr. Feliz (but not Ms. Ravelo). (Crim. No. 14-327, ECF nos. 1, 35) Those charges, involving conspiracy to distribute cocaine, were originally filed on March 7, 2014. The narcotics charges were pending and Mr. Feliz was on bail status on December 22, 2014, when the arrests at issue on this motion occurred. (*See* Crim. No. 14-327, ECF nos. 89, 90)

In the months following the search at issue here, Mr. Feliz entered pleas of guilty to both the narcotics charges and the fraud/tax charges. On March 19, 2015, Feliz pled guilty to one count of conspiracy to distribute 5 kilograms or more of cocaine. (Crim. No. 14-327, ECF nos. 142–44). On August 25, 2015, he pled guilty to a two-count Information charging him with mail fraud and tax evasion arising out of the law firm invoicing scheme. (Crim. No. 15-421, ECF no. 60). The Indictment against Ms. Ravelo was filed over two months later, on November 5, 2015. (ECF no. 66) Because he had already pled guilty, Mr. Feliz was named in Ravelo's Indictment as a co-conspirator but not as a co-defendant. Mr. Feliz has not yet been sentenced in either case.

3

travel to an initial appearance before a Magistrate Judge in Newark.[4] Because it would not be practical for Ravelo to dress with handcuffs on, the agents did not then re-handcuff her. (Tr. 25:4; 71:11)[5]

Agent Matejicka told Ms. Ravelo that she needed to get dressed and retrieve her passport. (Tr. 7:14) So that she could do so, Matejicka and Masessa escorted Ravelo down the hallway to the master bedroom. (Tr. 25:4, 53:3, 71:12)

Once in the bedroom, Ms. Ravelo picked up her iPhone from the night stand. (Tr. 8:1) Matejicka saw that Ravelo was typing on the screen, and concluded that she was trying to access the phone (an operation which requires typing in a password or code). (Tr. 8:3, 28:19) It appeared to Matejicka that Ravelo was attempting to make a phone call. (Tr. 41:5–12)

Matejicka did not take the phone away from Ravelo. (Tr. 28:19–29:14) Matejicka did tell Ravelo, however, that she was "not allowed to make any phone calls." (Tr. 8:10) Ravelo responded by "ask[ing] if she could provide a phone number to the attorney to one of her sons."[6] Matejicka responded "yes, after she [Ravelo] got dressed." (Tr. 8:12–14)

Ms. Ravelo, accompanied by Agent Matejicka, then walked to the master closet to get dressed. (Tr. 8:15–19) As they walked to the closet, Ravelo was still carrying the cell phone. (Tr. 29:15–22, 31:20) Once the two entered the

---

[4]     Matejicka's recollection was uncertain, but she believed Ravelo was wearing a nightgown. The other witnesses recalled that she was wearing a T-shirt, or a T-shirt and shorts.

[5]     Matejicka testified that she felt secure in leaving Ravelo uncuffed because Ravelo was not regarded as a threat, she had been compliant, agents were in close proximity to her, and the house was by then secured. (Tr. 53:6) Although Matejicka did not know whether the master bedroom had been checked for weapons (Tr. 25:11–15), Masessa did recall that other agents had checked the room for weapons. (Tr. 71:17) Ravelo was later handcuffed for transport to her initial appearance in Newark. (Tr. 77:12)

[6]     The agent testified that this response by Ravelo confirmed her initial impression that Ravelo had been attempting to make a phone call. (Tr. 41:5–12)

closet,[7] Ravelo "placed the phone down and then began to gather her clothes." (Tr. 8:22; *see also* Tr. 29:24, 32:5) Ravelo then donned street clothes.

Here is Matejicka's account of the events that immediately followed:

> Q      And after she got dressed, who picked up the phone from where Miss Ravelo had placed it?
>
> A      I did.
>
> Q      What if anything did you do concerning the telephone at that point?
>
> A      I asked Miss Ravelo for the code so I can retrieve the number for her attorney to provide to her son.
>
> Q      And did Miss Ravelo provide you with the phone –
>
> A      The code. I already had the phone.
>
> Q      Once you had the code, what did you do?
>
> A      I typed it into the phone and unlocked it.
>
> Q      And when the telephone unlocked, what if anything did you observe?
>
> A      The email application was opened and I observed on the top an email either to or from Mr. Gary Friedman.

(Tr. 9:1-18) On cross-examination, Matejicka explained that she, rather than Ravelo, picked up the phone "[b]ecause it was there," which I take to mean that its location was convenient to Matejicka at the time. (Tr. 32:15–19) Matejicka picked up the iPhone with the intent that, after obtaining the access code from Ravelo, she would "give the [attorney's] phone number to her son as she had asked before." (Tr. 32:10–19)

Ravelo told Agent Matejicka the four-digit access code, and Matejicka typed it in. When she gained access, the email application was open, implying that it must have been open when the screen was last locked. (Tr. 33:15–25) It was then that Matejicka observed the Gary Friedman email.

Agent Matejicka immediately recognized that the presence of an email from Friedman was of evidentiary, even incriminatory, value. (*See* Tr. pp. 9–12,

---

[7]      The door to the closet was located just inside the entrance to the master bedroom. (Tr. 26:23–27:2) I clarified in questioning that this was a walk-in closet, measuring approximately 10 by 12 feet. (Tr. 77:3)

*passim*.). She testified that she knew from the investigation that Gary Friedman was a "possible co-conspirator of Miss Ravelo." (Tr. 10:17–19) Matejicka was aware that fabricated documents submitted by Ravelo in support of the fraudulent invoices originated with Tracy Kitman, who worked at Friedman's law firm. (Tr. 12:12–23) She was also aware that at least two payments had flowed from Ms. Ravelo's companies to Friedman.[8] (Tr. 12:24–13:4) Matejicka knew that prior investigation had revealed that Ravelo used a cell phone. (Tr. 13:23–25) The evidentiary value of the email evidence in demonstrating the relationship between Ravelo and Friedman, an alleged co-conspirator, was thus apparent to her.

The content of the Friedman email, however, was seemingly not visible. Matejicka did not open that email or ask Ravelo to open it. (Tr. 10:20–23) Instead, Matejicka "pressed the home button on the phone, which brought [her] to the main screen." (Tr. 10:25–11:1)

Agent Matjicka and Ms. Ravelo, now standing next to each other (Tr. 45:15), cooperated to retrieve her attorney's number from the iPhone:

> A    Before I did anything, Miss Ravelo had told me the number wasn't programmed in her phone and I went to the recent calls and I told her to scroll through until she identified the number for her attorney.

(Tr. 11:7–14)  Ravelo identified an out-of-state number in the recent call list as that of her attorney. (Tr. 11:7–10, 45:1–16) Matejicka left that number on-screen and handed the phone to Agent Garrido,[9] for the purpose of having Garrido relay it to Ravelo's son. (Tr. 11:11–14, 45:22–25, 46:20–24) Matejicka told Garrido the access code (Matejicka, recall, had just obtained it from Ravelo), and pointed out the attorney phone number. (Tr. 47:10)

---

[8]    In context, "companies" seems to be a reference to "Vendor 1" and "Vendor 2," allegedly formed by Ms. Ravelo and Mr. Feliz for the purpose of conducting the fraudulent invoice scheme. Those vendor companies are referred to in the criminal complaint, the search warrant affidavit, and the indictment.

[9]    Taking my cue from the government's submissions and the affidavit in support of the criminal complaint, I conclude that this is the proper spelling of the name rendered as "Durito" in the transcript.

I found Matejicka's testimony credible. She surely had a general professional interest in vindicating her police work and preserving the viability of a case she had worked on. Otherwise, however, she evinced no preexisting or current bias. On both direct and cross examination, she testified forthrightly and factually, without embellishment. I detected no slanting of answers, inappropriate volunteering of information, or conclusory language learned in search-and-seizure training. Where her recollection was not precise, she acknowledged as much. Her account was appropriately detailed, and those details cohered as a narrative. It is highly plausible, for example, that an arrestee, particularly one with Ms. Ravelo's legal training, would pick up her phone and seek to call her lawyer. It is also reasonable that for reasons of security, an agent would limit the arrestee's phone access during the arrest process. Having a third party call the lawyer is an obvious work-around, but one that required access to the attorney's phone number. Ms. Ravelo, it seems, did not have the number memorized, but it was stored on the phone. That, too, fits with the other details; the number was not so frequently used as to be in Ms. Ravelo's contacts, but needed to be retrieved from the call list. That Ms. Ravelo would permit the agent to retrieve the number fits with what her overriding desire would have been in that situation: to contact her attorney post haste. It aligns with her natural incentives. I also credited Matejicka's that her motivation in picking up the phone was to comply with Ravelo's expressed desire to retrieve the attorney's phone number.

SSA Masessa, an agent with 27 years' experience who retired after the events in question, was called by the defense. I find that she testified credibly, answering questions directly and appropriately acknowledging gaps in her knowledge or recollection. She corroborated much of what Matejicka said (and I have parallel-cited her testimony above). It is fair to say, however, that Masessa's recollection was less detailed than that of Matejicka.

Masessa corroborated Matejicka's testimony in several key particulars, as follows: Ms. Ravelo's son, she said, was taken downstairs early in the process. (Tr. 69:24) Ravelo was uncuffed and permitted to use the bathroom.

(Tr. 70:10) Matejicka told Ravelo she needed to get dressed for her appearance in Newark. The handcuffs were left off, and the two agents accompanied Ravelo to the bedroom so she could dress. (Tr. 71) Ravelo picked up a cell phone from the nightstand. (Tr. 72:21, 75:1) In the closet, Ravelo picked out clothes and Matejicka handed them to her so that she could dress. (Tr. 76:13–22)

Masessa heard Matejicka tell Ravelo that she could not use the phone. (Tr. 75:4) Masessa also recalled that Ms. Ravelo said she wanted to contact her attorney, and that Matejecki at some point took the phone. She could not remember, however, exactly when and where those events occurred, whether in the bedroom or in the closet. (Tr. 75:5–8, 75:19–76:6, 80:23–25) Masessa recalled that Matejicka and Ravelo exchanged words about contacting her attorney—but again could not recall with certainty whether this occurred in the closet or elsewhere. (Tr. 78:3–9)

Asked whether anyone sought Ms. Ravelo's permission to access the cell phone, Masessa answered, "I believe so, because she had wanted to contact her attorney." (Tr. 81:10–11) Masessa could not specifically quote what was said, however. (Tr. 81:12–21)

Masessa recalled specifically that the phone was given to Agent Garrido. (Tr. 78:23) She testified that it was not possible that it was brought downstairs by Ms. Ravelo's son. (Tr. 82)[10] Masessa was aware that someone, either Matejicka or Garrido, "looked at the phone to get the contact information," either in the closet or outside. (Tr. 79:3–17) Masessa herself was not involved, however, and knew nothing about how to access the phone. (Tr. 79)

As to some details, Masessa's recollection diverged from that of Matejicka. For example, Masessa believed that it was Agent Garrido, and not herself, who initially put the handcuffs on Ms. Ravelo; she recalled Ravelo's garment as a T-shirt, rather than a nightgown. (Tr. 68, 71, 74) These divergences did not exceed what would be typical of two people recalling events

---

[10]     Masessa started to speculate as to "[i]f there was another phone there …" but defense counsel cut her answer short and refocused her on the phone in question. (Tr. 82:14–19).

nearly two years old. Any imprecision in Masessa's testimony with regard to the seizure of the telephone may reflect her particular role; she was not directly involved in that seizure, and her observations were therefore incidental. It may also be partially explained by Masessa's retirement; she no longer was under a professional duty to maintain a record or memory of the events.

In short, the defense called a second witness whose involvement was less central, and predictably her testimony was less complete. There were certain inconsistencies and failures to recall, but these did not detract from my impression that Masessa testified truthfully to the best of her ability. In general, Matejicka and Masessa testified consistently. The third participant in the events in the closet, Ravelo herself, did not testify.

Finally, the defense called Michael Feliz, one of Ms. Ravelo's sons, who would have been approximately 16 years old at the time of these events. His account, which diverged significantly from those of Matejicka and Masessa, was as follows: Michael[11] testified that, after using the bathroom, Ms. Ravelo was immediately re-handcuffed and taken to the bedroom. He did not see or hear what Ms. Ravelo or the agents did or said when they were in the bedroom and the closet. When they emerged, as Ms. Ravelo was being taken downstairs, she called to Michael to contact her attorney. The attorney's phone number, she said, was in her cell phone, which was next to her bed. (Tr. 95:16–25) After asking the officers' permission, Michael recovered the phone from the bedroom and brought it downstairs. Michael knew the access code, and entered the code to access the phone. As he scrolled through recent calls, a male agent snatched the phone from his hand. The male officer asked Ms. Ravelo for the access code, saying he would recover the attorney's number. (Tr. 96–97) Ms. Ravelo declined to give the officer the code. (Tr. 98) The agents kept custody of the phone. Michael stated that he did not call the attorney. (Tr. 98, 105)

---

[11] I refer to Michael Feliz as "Michael" to distinguish him from other members of the family. Although his name is spelled "Michail" in the transcript, the submissions of defense counsel use the more common spelling, and I take my cue from them.

The defense, in its subsequent briefing, did not emphasize the testimony of Michael, but focused on an argument of law based on the facts as described by the agents.[12] I nevertheless comment on the credibility of Michael's testimony.

I do not credit Michael's account. First, the potential for bias is obvious. These events entailed the arrests of both parents. They were followed by his father's pleas of guilty to drug distribution and fraud charges. This surely had a great effect on a boy of 16, 17, or 18, and heightened his already strong incentive to exculpate his other parent. Second, Michael did not see or hear the critical events in the bedroom or closet. There may have been confusion about the cell phone, or Michael, not having been privy to the events in the bedroom, may have misinterpreted what then occurred downstairs. But in any event I cannot accept his version, which is directly contrary to the interlocking and credible testimony of the agents. Third, some of Michael's observations seem inconsistent with what would have been natural under the circumstances. I refer, for example, to the re-handcuffing of Ms. Ravelo preliminary to getting dressed, or the agents' granting him permission to recover the phone, then snatching it away. Fourth, his account is generally less plausible than those of the agents. The agents' accounts are internally consistent—*i.e.*, they set forth a narrative that makes sense in light of the exigencies of arrest and Ms. Ravelo's natural incentive to contact her lawyer as expeditiously as possible. Michael's account makes less sense, and is also uncorroborated by other evidence.

Finally, Michael, who says that he and his mother refused to reveal the iPhone's access code, cannot account for the agents' possession of the code. That is a major gap in his account. Of course Michael never claimed to have

---

[12]     "The government's argument that the Court should completely disregard the testimony of Michael Feliz, Govt. Br. 7, is unpersuasive, but it is also completely irrelevant. As explained in Ms. Ravelo's prior submission although she maintains that her son's version of events is more credible than that offered by SA Matejicka, even under SA Matejicka's version of evets, the warrantless seizure of the cell phone cannot be justified by the plain view exception." (Def. Post-hearing Reply Letter Brief, dated Oct. 17, 2017, ECF no. 107, at 1 n.1)

seen everything that occurred, and other explanations for the agents'
possession of the access code could be hypothesized. The record at the hearing,
however, contained no evidence of any such alternative explanation. The
agents' explanation—that Ravelo voluntarily revealed the code to them—is the
only one in the record, and it is a believable one.[13]

The agents retained the iPhone. Two days later, on December 24, 2016,
the agents obtained a search warrant for some of the information stored on the
phone. That warrant application relied in part on Agent Matejicka's observation
that there was an email to or from Friedman on the cell phone. (Mag. No. 14-
7269 (CLW). (For convenient reference, a copy of the warrant application is
attached to Ravelo's supplemental brief, ECF no. 106.)

### C.    Legal Discussion

The facts of this case, as I have found them thus far, lie at the
intersection of the consent and plain view exceptions to the Fourth Amendment
requirements of probable cause and a warrant.

The plain view exception has three requirements, which I will refer to as
steps 1, 2, and 3: "[U]nder the 'plain-view' doctrine . . . , [1] if police are lawfully
in a position from which they view an object, [2] if its incriminating character is
immediately apparent, and [3] if the officers have a lawful right of access to the
object, they may seize it without a warrant." *Minnesota v. Dickerson,* 508 U.S.
366, 374–375 (1993) ([bracketed] numbers added). *Accord United States v.
Stabile,* 633 F.3d 219, 241 (3d Cir. 2011); *United States v. Menon,* 24 F.3d 550,
559 (3d Cir. 2011). As is usual under the Fourth Amendment, the test is an
objective one; the government need not prove, for example, that its agent's

---

[13]    At oral argument on October 27, 2016, the government supplemented the
record by displaying the clear evidence bag containing the iPhone, which also
contained a slip of paper with the numerical access code written on it. Because the
agent/custodian proffered that he knew nothing about the origin of that slip of paper,
the defense declined the opportunity to cross-examine. I give this evidence
comparatively little weight, since its origin is unknown. At best, it corroborates the
fact, which does not seem to be disputed, that the government at some point
possessed the access code.

discovery of the evidence was inadvertent. *Horton v. California*, 496 U.S. 128, 130 (1990).

First, a word about what the issue is not. I suppose that everything seized by the police comes into plain view at some point. But this vernacular interpretation of "plain view" is not the correct one. An item, even if it is open to view, cannot be seized unless the officer, without violating the Fourth Amendment, is lawfully in a position from which it is immediately apparent that there is probable cause to associate the item with criminal activity. Where "the police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object," then the plain view doctrine does not justify its seizure. *Dickerson,* 508 U.S. at 375 (quoting *Horton,* 496 U.S. at 136). This is really an application of the fundamental anti-bootstrapping principle that probable cause must be assessed from the point of view of the officer at the time; that contraband was ultimately uncovered can never justify an antecedent search.[14]

The incriminating character of many an ordinary object cannot be known until a further search reveals its contents. Thus the police cannot simply observe, say, a wallet or a checkbook, seize it based on the plain view doctrine, and justify the seizure because the item turned out to contain incriminating material. *See United States v. Rivera-Padilla,* 365 F. App'x 343, 346 (3d Cir. 2010) (ordinary wallet cannot be seized under plain view doctrine because its contents are not visible or incriminating to the observer); *United States v. Wilson,* 36 F.3d 1298, 1306 (5th Cir. 1994) (ordinary checkbook cannot be

---

[14]     "It is axiomatic that hindsight may not be employed in determining whether a prior arrest or search was made upon probable cause." Wayne R. LaFave, 2 Search & Seizure § 3.2(d) (5th ed.) (citing *Wong Sun v. United States*, 371 U.S. 471, 484 (1963) ("That result would have the same essential vice as a proposition we have consistently rejected—that a search unlawful at its inception may be validated by what it turns up."); *Rios v. United States*, 364 U.S. 253, 261–62 (1960) ("If, therefore, the arrest occurred when the officers took their positions at the doors of the taxicab, then nothing that happened thereafter could make that arrest lawful, or justify a search as its incident.")).

seized pursuant to plain view doctrine, because its incriminating nature is not apparent unless and until the contents are read and analyzed).[15]

Agent Matejicka's initial observation of the cell phone in Ravelo's hand, then, does not satisfy the plain view doctrine—in particular, step 2. There is nothing incriminating about a cell phone as such, and physical observation of the phone, without more, does not furnish probable cause to search the data stored on the phone. *See Spencer v. Pistorius*, 605 F. App'x 559, 566 (7th Cir. 2015) (large sum of cash and multiple cellphones are relevant, but "cash and phones are not inherently incriminating and cannot alone supply probable cause to search"); *Hartmann v. Hanson,* 2010 WL 335677 (N.D. Cal. Jan. 22, 2010) (phone was not permissibly seized during a protective sweep; although it was in plain view, its incriminating character was not apparent). *Cf. Riley v. California,* 134 S. Ct. 2473, 2482 (2014) (even where cell phone is lawfully seized incident to arrest, a search warrant is required to inspect its contents).

Because the information stored on a cellular phone cannot be observed from the outside, the incriminating character of such information is likewise shielded from plain view. It follows that the incriminating character of the iPhone's contents could not have been "immediately apparent" to Matejicka at the time she initially saw or picked up the iPhone.

There may be a point, however, at which the incriminating nature of the evidence does become apparent. Here that point arrived when Matejicka looked at the phone's screen and saw that there was an email to or from Friedman. As to that limited aspect, the step 2 analysis is not strenuously contested. When Matejicka accessed the phone, the email application was open. I accept that the Friedman email was then in plain sight, without requiring any further manipulation by Matejicka. I further accept that, to someone who like

---

[15]     *Wilson* was overruled en banc on other grounds in *United States v. Gould*, 364 F.3d 578, 594 (5th Cir. 2004). *Gould* itself, however, was abrogated by *Kentucky v. King*, 563 U.S. 452 (2011).

Matejicka was versed in the facts of the investigation, the status of the email as incriminating evidence was immediately apparent.[16]

But wait, says Ravelo; this step 2 analysis gets us ahead of ourselves. This is all irrelevant unless, under step 1, Matejicka was lawfully in a position to see what she saw—*i.e.,* she cannot have violated the Fourth Amendement in *getting to* her plain-view vantage point. We arrive at the real issue. Ravelo contends that Agent Matejicka engaged in an illegal seizure at the very moment she picked up the telephone. According to this view of things, Matejicka had already violated Ravelo's rights when she looked at the phone screen; at the time she observed the Friedman email, says Ravelo, Matejicka was not at a lawful vantage point. She is therefore like the police officer who broke into a car trunk without a warrant and then claimed "plain view" of what was inside. Ravelo's argument has substance, but ultimately I do not agree with it.

Clearly, Ravelo is correct that a government agent cannot achieve a vantage point by means of a Fourth Amendment violation and then validly claim "plain view" as to what she observes there. Thus courts considering plain view challenges have frequently been called upon to distinguish a lawful

---

[16]   I discussed this aspect at pp. 5–6, *supra.* Ravelo replies that the Friedman email could also have been wholly innocent. That is so, but probable cause, as the name implies, deals in probabilities; to satisfy that standard, it is not necessary that innocent explanations be excluded. The government adds that in any event, evidence of the relationship among Ravelo, Feliz, and Friedman, even if not facially incriminatory, would be of evidentiary use in documenting the alleged scheme.

I do not rely directly on the Affidavit in support of the search warrant, Mag. No. 14-7269 (CLW) (copy attached to Ravelo Brief, ECF no. 106). It is instructive, however, in that it fleshes out the brief account given by Matejicka. The affidavit describes the invoicing scheme. It summarizes evidence that Ravelo communicated by cell phone, orally and by text message, in furtherance of the conspiracy. It summarizes evidence suggesting that Friedman was a co-conspirator. This included the fact that fraudulent documents submitted by Ravelo to Law Firm 2 originated at Friedman's firm; Friedman's receipt of money from Vendor 2's bank account (contrary to the usual direction of money flow between a vendor and a law firm); Friedman's three telephone calls to Law Firm 2 following Ravelo's resignation on behalf of and in support of Ravelo and Feliz, in which he addressed both the drug and fraud aspects. And, of course, it recites that a law enforcement agent had observed on the iPhone an email to or from Friedman on the date of the arrest. (Affidavit ¶ 27 & n.1)

14

vantage point from an unlawful one. A vantage point may be lawful, from a Fourth Amendment point of view, for any number of reasons. The possession of a warrant is the most obvious; thus an officer lawfully executing a warrant for certain identified evidence may seize other evidence that lies in plain view. *Horton v. California*, 496 U.S. 128, 131 (1990). But a warrant is not necessary, so long as the intrusion that brought the officer to her observation point was authorized under the Fourth Amendment:

> Where the initial intrusion that brings the police within plain view of such an article is supported, not by a warrant, but by one of the recognized exceptions to the warrant requirement, the seizure is also legitimate. Thus the police may inadvertently come across evidence while in 'hot pursuit' of a fleeing suspect. *Warden v. Hayden* [387 U.S. 294, 87 S. Ct. 1642, 18 L.Ed.2d 782 (1967)]; *cf. Hester v. United States*, 265 U.S. 57 [44 S. Ct. 445, 68 L.Ed. 898 (1924)]. And an object that comes into view during a search incident to arrest that is appropriately limited in scope under existing law may be seized without a warrant. *Chimel v. California*, 395 U.S. [752,] 762-763 [89 S. Ct. 2034, 2039-2040 (1969)].

*Id.* at 135; *see also Coolidge v. New Hampshire*, 403 U.S. 443, 466 (1971) (giving as examples "a warrant for another object, hot pursuit, search incident to lawful arrest, or some other legitimate reason for being present unconnected with a search directed against the accused"). So an officer who lawfully stands outside the privacy-protected curtilage of property may be entitled to the benefit of what can be seen from there. *United States v. Dunn*, 480 U.S. 294, 304 (1987). Likewise, an officer who lawfully stops a car for a traffic infraction may then seize drug paraphernalia lying in plain view on the car's front seat. *See Texas v. Brown*, 460 U.S. 730, 739–40 (1983); *see also New York v. Class*, 475 U.S. 106, 114 (1986) (evidence seen while legitimately looking for vehicle identification number).

The principle governing all these cases is apparent. The lawful execution of a warrant, the reasonable-suspicion traffic stop, and so on, place the officer at a lawful vantage point and therefore satisfy step 1; once that hurdle is surmounted, the ready observation of incriminating evidence satisfies step 2.

The obvious corollary, however, is that the police are not permitted to use their step 2 observations as retroactive justification for step 1.

Highly illustrative, says Ravelo, is *Arizona v. Hicks*, 480 U.S. 321, 325-326 (1987), a case which granted suppression. There, after a gunshot through the floor of an apartment injured a neighbor, officers lawfully conducted an exigent-circumstances entry to recover guns and other relevant evidence. One officer, however, moved a stereo turntable to look at its serial number. After running a check, he learned that it was stolen. The Court, per the late Justice Scalia, observed hypothetically that if the officer, based on prior knowledge, had possessed probable cause to believe that the turntable was stolen, the plain view doctrine would have sustained the seizure. *Id.* at 329. But that hypothetical, he wrote, did not match the facts of the case. The exigent-circumstances doctrine authorized a search of the apartment for guns and such. Moving the turntable to bring its serial number into view bore no relation to that exigent-circumstances apartment search; it was in effect a *second* search, one that would require its own, independent probable-cause basis. *Id.* at 324–25.[17] The government offered no such independent showing of probable cause to search the turntable; indeed, the turntable's status as stolen property was revealed only as a *result* of the incremental search for the serial number.

Is our case more like Justice Scalia's hypothetical (and therefore permissible), or more like the actual facts of *Hicks* (and therefore impermissible)? In my view, what distinguishes this case from *Hicks* is consent. Here, at plain-view step 1, consent plays the role of the initial warrant, the

---

[17]   Officer Nelson's moving of the equipment, however, did constitute a "search" separate and apart from the search for the shooter, victims, and weapons that was the lawful objective of his entry into the apartment. Merely inspecting those parts of the turntable that came into view during the latter search would not have constituted an independent search, because it would have produced no additional invasion of respondent's privacy interest . . . . But taking action, unrelated to the objectives of the authorized intrusion, which exposed to view concealed portions of the apartment or its contents, did produce a new invasion of respondent's privacy unjustified by the exigent circumstance that validated the entry.

*Id.* at 324–25.

16

curtilage doctrine, or the reasonable-suspicion car stop in the examples above. Ravelo's consent placed Agent Matejicka at a lawful vantage point from which she saw evidence in plain view on the cell phone screen.

A search based on consent is constitutionally permissible, irrespective of probable cause or a warrant. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). I therefore find persuasive the government's citation of *United States v. Varner*, 481 F.3d 569 (8th Cir. 2007) and *United States v. Jackson*, 414 F. Supp. 2d 495 (2006), for the proposition that the defendant's consent takes this case outside of the holding of *Hicks*.

In *Varner,* an arrestee asked to reenter his home to tell his girlfriend he had been arrested. Once inside, Varner asked to go to the basement to retrieve his cigarettes; the officers consented, but insisted on accompanying him. Varner then suggested that his girlfriend get the cigarettes; again, the officers insisted on being present. Varner agreed. When the officers accompanied the girlfriend to the basement, they saw marijuana and drug paraphernalia, which they seized. The Eighth Circuit agreed that the defendant's consent placed the officers lawfully on the scene in the basement, and that they therefore legitimately observed the drug evidence in plain view. 481 F.3d at 570–73.

In *Jackson, supra*, officers arrested the defendant, who was barefoot, at the door of his apartment. Jackson asked one officer to retrieve his shoes from the bedroom. While in the bedroom, the officer saw a handgun in plain view and seized it. Judge Wolfson held that Jackson had consented to the officer's entering the bedroom, and that therefore matters observed there were legitimately in plain view. 414 F. Supp. 2d at 504–08.

Such consent, of course, must be voluntary. And the voluntariness of consent depends on the totality of the circumstances:

> We consider such factors as "age, education, and intelligence of the subject; whether the subject was advised of his or her constitutional rights; the length of the encounter, the repetition or duration of the questioning; and the use of physical punishment." .
> . . . . The "'setting in which the consent was obtained [and] the parties' verbal and non-verbal actions'" are also relevant. Finally, .

> . . the Government need not inform the subject of his right to
> refuse consent.

*United States v. Stabile*, 633 F.3d 219, 231 (3d Cir. 2011) (citations omitted).

Now it is true that Ravelo's consent could have been more clearly documented—in writing, for example. I accept the testimony, however, that oral consent was actually given; we are not in the gray area of "implied consent." Nor do we face the far more common, if counterintuitive, scenario of a subject's granting consent to rummage through her home or car in search of evidence. Consent to such plenary searches is more commonly (though not necessarily) documented in writing.  This situation, by contrast, involved not a search for evidence, but a common feature of the arrest process: the arrestee's call to his or her attorney. As in *Varner* and *Jackson*, the agent sought only to retrieve a particular item that the arrestee herself wanted, at the arrestee's request. In such a situation, the indicia of coercion tend to be absent. That Ravelo consented is the clear upshot of the testimony.

Based on the facts as I have found them, Ravelo voluntarily granted Matejicka access to her phone so that she could recover the telephone number of her attorney. She stands in the shoes, as it were, of the barefoot Jackson. Like him, she urgently needed a particular item—there a pair of shoes, here the attorney's phone number—in connection with her arrest. Like him, she probably would have preferred to recover the desired item herself. In the context of an ongoing arrest, however, the officer was not going to permit free access.[18] With knowledge of those security constraints, Ravelo, like Jackson, consented to the officer's recovering the item for her. She granted access to the iPhone for that limited purpose. In fact Ravelo observed, participated in, and directed the agent's recovery of the phone number.

---

[18]    The arresting officer is not required to afford the arrestee unfettered and unsupervised access to her property. The officer's authority to insist on accompanying the arrestee, to ensure safety as well as the integrity of the arrest, is unquestioned. *See Washington v. Chrisman*, 455 U.S. 1, 7 (1982).

Ravelo, a graduate of a leading law school who went on to become a partner at two major New York law firms, does not really argue that her consent was uninformed or involuntary. Rather, she objects that the seizure was complete when the agent picked up the phone, vitiating consent. I disagree.

Ravelo, barred from using the phone herself, asked to provide the attorney's phone number to one of her sons, and Matejicka agreed. Ravelo put down the phone while she dressed. Matejicka then picked up the phone and asked Ravelo for the access code so that she could retrieve the attorney's phone number. Ravelo furnished the access code. She did so voluntarily, within the constraints of the agent's earlier statement that she would not be permitted to make calls herself.

From Ravelo's statements prior to Matejicka's picking up the phone, Matejicka knew that Ravelo *wanted* the number recovered from the phone. Ravelo did not have the phone number committed to memory, or she simply would have told it to the agent. Matejicka drew the correct implication that the phone number would have to be recovered from the iPhone. Ravelo knew, and the agent knew that she knew, that she would not be permitted to manipulate the phone herself. I accept Matejicka's testimony, corroborated by that of Masessa, that she picked up the iPhone solely for the purpose of responding to Ravelo's expressed desire to get her attorney's phone number.[19] The act of

---

[19]   Had Matejicka intended to take custody of the phone, presumably she would have taken it from Ravelo after she attempted to make a call. Nothing happened to change Matejicka's mind in the short period of time occupied by the walk from the nightstand to the closet and Ravelo's donning of her clothes. This tends to corroborate Matejicka's testimony that she picked up the phone only to assist in getting the attorney's phone number. At the moment she picked up the phone, the agent, who lacked any probable cause basis to bag the phone as evidence, and did not do so. She became focused on seizing it as evidence only after seeing the Friedman email. I do not suggest, incidentally, that the issue turns on the agent's subjective state of mind; I find that the objective circumstances reasonably conveyed that Ravelo consented to a limited search of the phone for the attorney's number, and that Ravelo knew that such a search would have to be done by the agent, not herself.

I note but do not rely on a still more fundamental argument as to the exigencies of arrest and the nature of a seizure. Surely not everything an officer touches in the

picking up the phone was within the scope of Ravelo's request as the agent
reasonably understood it. Ravelo's voluntary furnishing of the phone's access
code was a further manifestation of consent, on which the agent could
justifiably rely. Consent was confirmed when Ravelo did not object to the
agent's handling the telephone. Indeed, she told the agent how to find the
relevant phone number. She told the agent the number was not in her stored
contacts, and the agent therefore made no effort to look there. Instead, the two
handled the phone cooperatively, standing side by side and scrolling through
the list of recently called numbers until Ravelo picked out the right one.

The circumstances as a whole point unambiguously to consent. I
therefore decline Ravelo's invitation to ignore the surrounding context and
consider only the fact that Matejicka picked up the phone. Matejicka picked up
the phone knowing that Ravelo had expressed a desire to recover the attorney's
phone number, and knowing that Ravelo then understood she would not be
permitted to access the phone herself.

Consent, of course, may be limited. *See Florida v. Jimeno*, 500 U.S. 248,
252 (1991) ("A suspect may of course delimit as he chooses the scope of the
search to which he consents"). An officer may thus lose the protection of a
lawful vantage point if she exceeds the bounds of the consent granted by the
arrestee (just as the officers in *Hicks* exceeded the bounds of the exigent-
circumstances search). The proper scope of a consent search is measured by a
test of "'objective' reasonableness – what would the typical reasonable person

---

ordinary course of the arrest process is "seized" for purposes of the Fourth
Amendment, just as not every question asked in the course of routine booking is
"interrogation" for purposes of the Fifth. Getting dressed and making a phone call to
one's attorney are ordinary features of an arrest. The government suggests an analogy
from the "clothing exception" cases, which do not rely on consent, but on the inherent
necessity of permitting an unclothed arrestee to get dressed, and which by extension
authorize plain view seizure of evidence observed during that process. *See, e.g.,
Jackson*, 414 F. Supp. 2d at 504–05 (citing but not relying on "clothing exception"
cases). Because I find effective consent here, I do not discuss the issue any further.

have understood by the exchange between the officer and the suspect?" *Id.* at 251.

I find that the consent given here would logically be limited to acts reasonably required to locate the attorney's number. Thus if Agent Matejicka had rummaged through the emails on the cell phone, matters she observed would not properly fall within the scope of the plain view doctrine. But she did not. As I have found, she accessed the cell phone using the code provided by Ravelo, for the limited purpose of finding the attorney's phone number. When Matejicka unlocked the phone screen, the email application was open. Matejicka immediately, perhaps unavoidably, saw that there was an email to or from Friedman. She did not open that, or any, email. She did not examine the stored contacts on the phone, because Ravelo told her the attorney's number would not be there. Rather, Matejicka immediately proceeded to the recent calls list, as directed by Ravelo, who looked on the entire time. She did so in pursuit of the narrow goal of finding the attorney's phone number. Finding the number (and *now* knowing, as she had not known before, that the phone contained incriminating evidence), Matejicka handed the phone to Garrido and pointed to the attorney's number on the screen, so that a third party could phone the attorney.

To summarize, Ravelo's consent authorized Matejicka's picking up the phone and entering the access code to unlock the phone screen, satisfying step 1. From that lawful vantage point, Matejicka observed in plain view the Friedman email. Matejicka did not exceed the scope of her lawful access. The motion to suppress evidence and for return of property is therefore denied.[20]

---

[20]     I therefore do not reach the government's alternative argument under the inevitable discovery doctrine.

## ORDER

The defendant having moved for suppression of evidence recovered from her cellular telephone pursuant to Fed. R. Crim. P. 41(h) (ECF no. 84); and the government having responded that the motion was premature (ECF no. 85); and the defendant having filed a reply (ECF no. 86); and the Court having heard oral argument on June 27, 2016, at which the defendant argued in the alternative for return of her property pursuant to Fed. R. Crim. P. 41(g); and the Court having accepted supplemental briefing from both sides (ECF nos. 90, 91); and the government having moved to quash subpoenas, and the defendant having filed a response (ECF nos. 98, 99); and the Court having convened an evidentiary hearing on September 19, 2016; and the parties having submitted post-hearing briefs (ECF nos. 105, 106, 107, 108); and the Court having heard additional oral argument on October 28, 2016 (ECF no. 109); and the Court having considered the matter, and good cause appearing therefor;

IT IS this 29th day of November, 2016

ORDERED that the motion to quash subpoenas (ECF no. 98) is GRANTED IN PART AND DENIED IN PART, for the reasons stated on the record at the suppression hearing (Tr. 54–55, 62, 89–90); and it is further

ORDERED that the defendant's motion for suppression of evidence and return of property (ECF no. 84 *et seq.*) is DENIED.

_____
**KEVIN MCNULTY, U.S.D.J.**